## PULLMAN, Inc., et al. v. MARSHALL ELECTRIC CO.

### No. 5113.

Circuit Court of Appeals, Seventh Circuit.

June 27, 1934.

Rehearing Denied Oct. 4, 1934.

George L. Wilkinson, of Chicago, Ill., Robert S. Blair, of New York City, Delos G. Haynes, of St. Louis, and Edward F. Dunne, Jr., of New York City, for appellants.

Donald M. Carter, of Chicago, Ill., for appellee.

Before ALSCHULER, SPARKS, and FITZHENRY, Circuit Judges.

SPARKS, Circuit Judge.

Appellee brought this action to recover for infringement of claim 7 of Chandeysson United States patent No. 1,564,939. Appellants pleaded invalidity and non-infringement, and by counter-claim, the appellant, The Safety Car Heating and Lighting Company, charged appellee with infringement of certain claims of United States prior art patents owned by it, as follows: Moskowitz, No. 1,291,597, claims 11, 19, 20, 21, and 23; Bijur No. 1,260,995, claims 17, 18, 19, 20, and 33; and Armstrong No. 1,163,306, claims 25 to 32 inclusive. To this counter-claim appellee pleaded invalidity and non-infringement, and the cause was referred to a special master. Upon the facts found in the master's report he concluded that claim 7 of the Chandeysson patent was valid but not infringed; that the claims of the Moskowitz patent and those of the Armstrong patent were valid and infringed by Chandeysson; that claims 17, 19, 20, and 33 of the Bijur patent were invalid in view of Moskowitz; and that claim 18 of Bijur was valid but not infringed by Chandeysson. He further concluded that appellee was entitled to no relief and that its bill should be dismissed, and that appellant was entitled to the relief prayed for in its counter-claim.

The District Court decreed that claim 7 of the Chandeysson patent was valid and infringed and that it did not infringe any of the said claims of Moskowitz, Bijur or Armstrong, and that appellee was entitled to the relief prayed for in its bill. The counter-claim was accordingly dismissed, and from that decree this appeal is prosecuted.

The patents in suit relate to regulators which comprise carbon piles and are particularly adapted, but not limited, to use in car lighting systems to control the voltage to which the lamps are to be subjected. Generally the patents show and describe regulators comprising carbon piles that may be connected in series with lamps, means being provided whereby the electrical resistance of the carbon piles is varied in response to variations in voltage in the lamp circuits. The means comprise in each instance an electric magnet or solenoid which, acting in response to changes of voltage across its winding, either releases the pressure to which the carbon piles are subjected or subjects them to such pressure. The carbon piles comprise a plurality of carbon disks in contact with each other. When compressed their electrical resistance is lowered, and when released from pressure they elongate and increase in electrical resistance.

The Chandeysson patent discloses a regulator which in one form comprises such a carbon pile 4, positioned within an insulating tube 5. Metallic disks 3 in the ends of the tube are insulated from the pile by insulating disks 6, as shown in Fig. 8. A thrust member, or a fixed supporting member, equipped with a conical projection, is socketed in a corresponding recess formation in one of the metallic disks, as at 13, Fig. 9. A similar

conical projection 24 is socketed in a corresponding recess formation in the other metallic disk, the latter conical projection being pivotally connected at 21 with a lever 20, which at its right end carries the core or plunger 19 of the solenoid 17. The lever 20 also carries a rigid riser 25 through which an adjustable screw 13 is threaded. 26 designates an optional stop pin which prevents the lever 20 from descending by force of gravity or other means below that point. It

is to be noted that the member extending from 21 to 24 is rigidly and firmly attached to frame 15, and the carbon pile with its insulating tube is held in suspension by the conical projections at each end. When the core of the solenoid 19, which is a part of the lever 20, is raised or lowered, it necessarily raises or lowers the right end of the carbon pile and its container, and this action is permitted by the pivotal action at 24 as well as the pivotal action at 21. When the solenoid is not energized, the right end of the carbon pile is held at its lowest point by gravity, which is an equivalent of the spring used in appellants' device, and the carbon pile then reaches its highest point of compression and conductivity. When the solenoid 17 is energized it draws the core 19 and the lever 20 and the right end of the carbon pile upwardly as shown by the dotted lines in Fig. 9. This of necessity releases the pressure on the carbon pile which results in a corresponding decrease in its conductivity.

Chandeysson in his application said:

"While compressible resistances of the general type of carbon piles have long been employed, such carbon piles have commonly been objectionable both because of the variations in resistance due to friction between the disks of the pile and to friction between the disks and their inclosing tube, and because of the irregular variations in resistance due to a relative tilting or canting of the disks constituting the pile. For example, such carbon piles have commonly been mounted on a rigid support and the variation in pressure has commonly been exerted in such a way as to tend to rotate, tilt or otherwise shift the relative position of the carbon disks comprising the pile, thereby introducing both a waste of energy in the mechanism employed for varying the compression and an uncertainty as to the effective resistance secured with any particular position of this mechanism. Both this waste of energy and the uncertainty as to the resulting resistance have been further increased by the friction of the disks against the tube inclosing the same and by the friction in the mechanism employed for varying the compression.

"Moreover, the mechanisms commonly employed for varying the compression of a compressible resistance have disregarded the fact that the change in resistance does not vary uniformly with pressure but varies according to a hyperbolic function of the pressure. Consequently, where the movement of the actuating member is substantially in proportion to the actuating effort, as in the case

of a solenoid moved by the flow of current through the solenoid, the resulting change in pressure did not respond with any uniformity to the changes in the actuating effort. * * *

"My present invention aims to overcome all of the above named objections to rheostats of the compressible resistance type and aims to do so by employing an exceedingly simple and durable arrangement of parts. For this purpose, my invention aims to provide a construction in which the carbon pile is movable as a unit and is not supported by the tube or other guide which maintains the carbon disks in alinement, and one in which the pressure is applied to the carbon pile axially of the latter so as to prevent any relative movement of the constituent disks, thereby eliminating the heretofore objectionable friction and uncertainty of the resulting resistance."

Claim 7 of Chandeysson, upon which appellee solely relied, is as follows:

"7. In combination, a compressible resistance, thrust means pivotally connected to the resistance at one end, and a lever pivotally connected to the other end of the resistance and co-operating with the thrust means in affording the entire support for the resistance."

This claim covers what was referred to in the record by appellee's expert as the "floating pile construction" although that name is not given to it in either the claim or the specifications. It means that when the regulator is in operation the carbon disks are suspended and supported solely by the thrust means and the lever and that they do not touch the insulating tube 5 which surrounds them.

Appellants' apparatus of which appellee complained is referred to as "Safety Type J" lamp regulator which was first manufactured subsequent to a disclosure by appellee's predecessor to appellant, Safety Car Heating and Lighting Company. It is stipulated that appellant, the Safety Company manufactured and sold the alleged infringing devices within six years prior to the filing of the bill, and that the other appellants used said devices during that period of time.

"Type J" regulator comprises three carbon piles not encased in a tube or cylinder, as are those of the patent, but they are provided with supporting rods of lavite beneath each pile. Each of the carbon piles has one end abutting against a fixed abutment. A pressure plate abuts against the other end of the carbon piles, which plate is pivoted to a pair

of links, which in turn are pivoted to the frame of the regulator, that is to say, the pressure plate is suspended from the frame by the links. In some of the "Type J" regulators, two pairs of links were employed, but so far as infringement is concerned the mode of operation is the same whether a single or double pair of links is used. The pressure plate is pivotally connected to one end of a link which has its other end pivoted to a lever which in turn is pivoted to the frame. An armature is secured to one end of the lever and is operatively disposed with respect to an electro-magnet. A spring yieldingly urges the lever in one direction to compress the carbon piles and against the action of the magnet which tends, when energized, to attract the armature so that the pressure on the carbon piles will be relieved.

It is contended by appellee that the alleged infringing devices of which "Type J" is typical, are so constructed that when they are in operation, the carbon piles are lifted from the supporting rods, and all friction between the supporting rods and the carbon disks is eliminated. Appellee therefore argues that the connections at the ends of the carbon piles afford the entire support therefor, and it further contends that the pivotal connections at both ends of the pile called for in the claim are met by the unquestioned pivotal connection at one end of each of appellants' carbon piles and by the flat abutment at the other end of the pile. The court concurred in these contentions and did not sustain the master's conclusions. In this we think the court's ruling was erroneous.

It is obvious to us that the flat, rigid abutment in type J is not a pivotal connection in any way, and that it will not permit a pivotal action of any kind. Appellee's expert witness, however, testified that as a result of non-interparty tests of appellants' devices, made by him, he observed that when the device was in operation the carbon piles were thereby lifted entirely from the lavite supports. This fact was sharply contradicted by evidence introduced by appellants. Demonstrations were made before the master by appellants' experts at the Safety Company's laboratory in Connecticut, and their testimony was taken in the presence of the master. He found from a preponderance of evidence that in "Type J" regulator, when the carbon disks are under compression by the action of the spring, there is a slight raising of the carbon pile from the lavite supports, and this raising diminishes as it approaches the right end of the pile which joins

the solid abutment. He found that this lifting effect was present in prior art regulators type F, Gould 14,705, and Bijur. He further stated that the carbon piles in type J, type F and Gould regulators bend, cant, or tilt when the ends engaged by the movable pressure plates are raised above the supporting rods a greater distance than the ends which join the fixed abutments on the frame, in types J and F, or in case of the Gould type, the second movable pressure plate which engages the head of an adjusting screw.

The bending or canting or tilting of the carbon piles in the prior art, as well as in type J, are conditions which Chandeysson attempted to eliminate, and he claims to have done so by swinging the carbon pile as a unit between the two pivotal connections at its ends, which pivotal connections form the entire support of the carbon pile and its enclosing tube. The master said that the flat abutment provided at one end of each carbon pile in type J and type F regulators would not permit such swinging movement of the carbon piles which abut them, and that the carbon pile of the type J regulator must bend throughout its length. He observed that there was no conclusive evidence that the Chandeysson carbon pile did not contact its enclosing tube when it was in operation, and that the Chandeysson carbon disks might be displaced from the contact with the tube to the same extent and for the same reason that those of Gould and type F regulators were raised from their supporting rods when under compression. He concluded therefore that the flat abutment of type J was not a "thrust means pivotally connected" as called for in claim 7, and that it was not an equivalent thereof; that the connections at the ends of type J carbon piles did not afford their entire support in the sense contemplated in claim 7, and that to hold otherwise would be to invalidate the claim in view of the prior art such as type F, and the Gould types. He also referred to Turbayne patent No. 1,259,-172, granted March 12, 1918, as typical of the prior art, which provides a carbon pile, having supporting rods, one end of which is pivotally connected to a lever. The other end of the carbon pile rests against an abutment as in type J which if it is to be considered as a pivotal connection obviously anticipates the patent in suit. We think the evidence is conclusive in support of the facts found by the master in this respect, and his conclusions seem to us to be inescapable. We therefore hold that appellants have not infringed claim 7.

The next question presented is whether the claims of the Moskowitz, Bijur, and Armstrong patents, hereinbefore referred to, are valid, and if so, whether they are infringed by Chandeysson.

No prior art patents in anticipation of the claims in suit were set up in the answer to the counter-claim, but during the taking of depositions several were introduced which the master thought were no more pertinent to Moskowitz than the patents originally considered by the several tribunals of the patent office during the successful prosecution of the Moskowitz application, which included an interference with an application of Bijur, but not that one which resulted in the Bijur patent involved in this suit.

With respect to Moskowitz, No. 1,291,597, claims 11 and 19 were considered as typical.[1]

This patent discloses a regulator having a pair of oppositely disposed carbon piles. A solenoid and a spring, acting in opposition to each other, are connected operatively to the carbon piles through a toggle. The spring tends to release the pressure on the carbon piles, and the solenoid when energized increases it.

The Bijur patent discloses a pair of carbon piles extending between a fixed abutment and a movable pressure plate, the pressure plate being connected to one end of a member which constitutes part of a toggle mechanism. A spring acting upon the toggle tends to bring the toggle members into a straight line to increase the pressure on the carbon piles. An armature, cooperating with an electric magnet, acts against the spring when the electric magnet is energized. The arms of the toggle are disposed in positions relative to each other so that the mechanical advantage of the toggle increases at a rate corresponding to the increase in mechanical

---

[1] "11. In an electric regulator, a variable pressure rheostat, an operating winding therefor, said elements being arranged with their longitudinal axes at an angle to each other, mechanical connections between the adjacent ends of said elements governed by said windings to vary the pressure on said rheostat, said mechanical connections including links arranged at a toggle."

"19. Regulating apparatus comprising, in combination, a pressure-controlled variable resistance medium, means comprising a toggle adapted to vary the compression of said medium, means tending to move said toggle in one direction, and an electromagnet tending to move said toggle in the other direction."

478

resistance of the carbon pile when it is subjected to pressure.

In claim 20 of the Bijur patent[2] the toggle element is defined as "means for exerting pressure upon said medium to compensate for the effect of said mechanical opposition." In claim 17 it is defined as "means for causing variations of pressure upon said medium substantially corresponding to the variations of mechanical resistance to compression by said medium." In claim 18 it is defined as "means for exerting pressure upon said medium at an increasing rate as compression progresses." Claims 19 and 33 are quite similar in this respect to claims 17, 18, and 20.

█ It was contended by appellee that the Bijur claims in suit were not valid in view of Moskowitz, and the master sustained this contention except with respect to claim 18. In this we think he was right. We are unable to detect any substantial difference in the language of claim 20 of Bijur from that used by Moskowitz. Indeed, it is quite obvious that Moskowitz had a clear conception of the characteristics of a toggle mechanism and that he understood and disclosed the fact that the toggle could be designed in such manner as to "exactly compensate for the increasing mechanical resistance to compression of the carbon piles as compression proceeds." The master, however, held Bijur claim 18 valid and distinguished it from the other Bijur claims in suit, and we think rightly so, by reason of the fact that claim 18 states that the means including the toggle for exerting pressure upon the carbon pile are controlled by electro-magnetic means in such manner that the changes of electrical resistance in the carbon pile are substantially proportional to changes of current in the electro-magnetic means.

█ The Armstrong patent comprises a carbon pile which has one end abutting against a fixed support. The other end of the carbon pile is engaged by a movable pressure plate. One arm of a toggle is operatively connected to the pressure plate, the other arm of the toggle being provided with an armature which is associated with an electric magnet. A spring, acting on the toggle, tends to compress the carbon pile. The electro-magnet, when energized, acts in opposition to the spring. The toggle, the spring, the armature, and the electro-magnet are designed so that when a given current is flowing through the winding of the electro-magnet, the armature may be moved to any position within the operating range thereof and will remain in that position. The electro-magnet then co-acts with its armature to hold the carbon pile at any state of compression. Claim 25, set forth in the margin,[3] was considered as typical of the other claims in this patent.

Appellee relied upon four prior art United States patents as anticipatory of the counter-claim patents: Thomson, 926,518, a self regulating dynamo device; Smith and Larsen, 1,031,387, an alternating current switch; Wood, 958,788, an electric remote control switch; and Waterhouse, 294,169, a regulator for a dynamo electric machine.

The Thomson patent does not include a toggle element. If it anticipates Moskowitz it certainly anticipates Chandeysson, but we think it anticipates neither. It is owned by counter-claimant, but it was declared invalid in 1916 for want of patentable novelty. Safety Car Heating & Lighting Company v. United States Light & Heating Company (D. C.) 222 F. 320; Id. (C. C. A.) 229 F. 990. Smith and Larsen has no rheostat nor does the device act as a regulator of any kind. Wood has neither a rheostat, carbon pile, nor mechanical compensator. It has no regulating features, and bears no relation whatever to an electric regulator. In Waterhouse there is no toggle, no mechanical compensator, and no mechanical advantage is produced such that the carbon pile may be held at any one of a plurality of states of compression for a given value of the electric factor to be controlled. This patent was unsuccessfully cited against Moskowitz' application. The Thomson, and the Smith and Larsen patents were not issued prior to the filing of the Moskowitz application.

The Wood, and the Smith and Larsen patents made use of the toggle element, but for quite a different purpose from Moskowitz. They used it for opening and closing and

[2] "20. Regulating apparatus comprising, in combination, a resistance device exerting an increasing mechanical opposition to force tending to decrease its value, means for exerting pressure upon said medium to compensate for the effect of said mechanical opposition, and electro-magnet means for controlling said compensating means."

[3] "25. In regulating apparatus, in combination, a pressure controlled variable resistance medium, a toggle adapted to vary the pressure upon said medium, an armature associated with said toggle, and an electro-magnet adapted to coact with said armature in holding said medium at any stage of compression with a given current through said magnet."

forcibly holding together the contacts of a switch, and not for the purpose of electrically regulating the rate of increase or decrease of pressure to govern correspondingly the increase and decrease of resistance. It is true the use of a toggle in electrical devices was not new when the Moskowitz application was filed, and he neither asked for, nor was he granted a patent on the toggle, but he was granted one upon its use in combination with a compressible resistance in a regulator. We think the uncontradicted evidence falls far short of overcoming the presumption of novelty which attaches to the issuance of the patent.

It is contended by appellee that Chandeysson does not comprise a toggle or its equivalent, and the trial court sustained that contention, and for that reason alone held that Chandeysson did not infringe. That ruling we think was erroneous. Appellee relies upon Webster's definition of the word "toggle" as being a "toggle joint, elbow or knee joint consisting of two bars so connected that they may be brought into a straight line and produce endwise pressure." Appellants' expert defined it as a "work member and two other members so arranged in a triangle that upon application of a force tending to flatten the triangle, a mechanical advantage is obtained which increases as the triangle is flattened." Both definitions we think accurately define the word, and they are not inconsistent. The last definition may be illustrated with Fig. 9. If the cylinder, or work member 5, were sufficiently small in diameter to permit a member to be inserted along the line from 21 to the right end of the conical projection, say at 13, that member would form a triangle with members 21 to 24 and 24 to 13, the last mentioned member consisting of the carbon pile and the conical projection at its right end. Pressure applied downwardly to the longest side of the triangle, or upwardly to the apex 24, would tend to flatten the triangle and bring its three sides into alinement, thereby producing endwise pressure which would be reflected axially on the carbon pile, as that is the only compressible resistance involved. The toggle joint in that instance would be at 24. In the Chandeysson patent the carbon pile is too large in diameter to permit the use of the third member or side of the triangle, at least in a straight line, but in principle and effect it is present. The force there used to flatten the triangle is by means of the lever 20 applied to 13 by means of the riser which is a part of the lever, and the toggle action at 24 is precisely the same as if the lever were positioned above the

cylinder. This would amount to an equivalent if not the precise thing. But discarding the definition of a toggle as used by appellants' expert, and relying on appellee's definition as found in Webster, that element is even more obvious, an elbow or knee joint 24, consisting of two bars, 21 to 24 and 24 to 13, so connected, at 24, that they may be brought into a straight line, by downward pressure of the lever 20, which includes 19 and the riser which engages 13, and thus is produced endwise pressure, along the axis of the carbon pile. This conclusion is further fortified by the admission of appellee's witness, Mr. Marshall, who was president of appellee's predecessor, and by their expert witness, and also by their specifications and their figures 5 and 6 which are triangular figures illustrative of the toggle effect. Appellee attempts to distinguish between a toggle and a toggle effect. Of course one effect of a toggle is to produce force, but when Mr. Marshall referred to "toggle effect," he obviously meant more than mere force, such as produced by a simple lever. This conclusion is warranted by the following language found in the specifications:

"* * * It also aims to provide an arrangement in which the pressure applied to the carbon pile will be a hyperbolic function of the movement of the actuating member, so that by suitably proportioning the various parts I can make this hyperbolic relation correspond to the above mentioned relation between the variations of pressure and resistance in a carbon pile and hence can make the resulting resistance uniformly responsive to the movement of the actuating member. Furthermore, my invention aims to accomplish this last named purpose by providing an exceedingly simple construction employing three relatively movable members interconnected in the form of a triangle with pivotal movement about each apex of the triangle and with the carbon pile or other compressible resistance forming one side of the triangle."

The record discloses no helpful definition of the word "hyperbolic" but in the sense in which it is used in the specifications it obviously means an exaggerated or a proportionately increased pressure as the sides of the triangle, or the two bars, are brought into alinement. From these considerations we are convinced that the Chandeysson patent comprises a toggle, and that the master's findings and conclusions were correct.

The decree of the District Court is accordingly reversed, and the cause is remanded

with instructions to approve the master's report and for further proceedings not inconsistent with this opinion.